1  Remy Kessler (SBN 123165)
   rkessler@reedsmith.com
2  REED SMITH LLP
   355 South Grand Avenue, Suite 2900
3  Los Angeles, CA  90071-1514
   Telephone:  (213) 457-8000
4  Facsimile:   (213) 457-8080

5  Elizabeth J. Boca (SBN 255719)
   eboca@reedsmith.com
6  REED SMITH LLP
   101 Second Street, Suite 1800
7  San Francisco, CA  94105-3659
   Telephone:  (415) 543-8700
8  Facsimile:   (415) 391-8269

9  Attorneys for Defendant
   RADIOSHACK CORPORATION

10

**UNITED STATES DISTRICT COURT**

11

**CENTRAL DISTRICT OF CALIFORNIA**

12

13  DANIEL ORDONEZ, individually, and on behalf of all similarly situated current and
14  former employees of RadioShack

15            Plaintiffs,

16       vs.

17  RADIOSHACK, a Delaware corporation; and DOES 1 through 100, inclusive,
18
            Defendants.
19

20

21

Case No.: CV 10-07060 CAS (JCGx)

**DECLARATION OF STEFAN BOEDEKER IN SUPPORT OF DEFENDANT RADIOSHACK CORPORATION'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION; EXHIBIT**

Date: November 19, 2012
Time: 10:00 a.m.
Courtroom: 5

22

23

24

25

26

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

US_ACTIVE-110624481.1
DECLARATION OF STEFAN BOEDEKER
CASE NO.: CV 10-07060 CAS (JCGX)

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

I, Stefan Boedeker, declare the following:

1.      I am a Statistician and an Economist.  I received a Bachelor of Science degree in Statistics and a Bachelor of Arts degree in Business Administration from the University of Dortmund/Germany in 1988.  I received a Masters of Science degree in Statistics from the University of Dortmund/Germany in 1988, and I received a Masters of Arts degree in Economics from the University of California, San Diego in 1992.  I also finished Ph.D. requirements except dissertation in Economics at the University of California, San Diego.  Attached hereto as Exhibit A is a true and correct copy of my *curriculum vitae*.

2.      I am currently employed as a Director at the Berkeley Research Group in its Los Angeles office.  Prior to joining the Berkeley Research Group I was a Partner at Resolution Economics and I held Managing Director positions at Alvarez & Marsal and Navigant Consulting.  I also held an Expert Director position at LECG.  I also held partner level positions at Deloitte & Touche LLP, PricewaterhouseCoopers LLP, and Arthur Andersen LLP.  At the three latter firms, I was responsible for the Economic and Statistical consulting group on the West Coast.  Before moving to the United States to attend graduate school, I worked as a statistician for the German Government for three years, from 1986 to 1989.

3.      My work focuses on the application of economic, statistical, and financial models to a variety of areas, such as providing solutions to business problems, supporting complex litigation, and drafting economic impact studies.  I have extensive experience applying economic and statistical theories to employment related matters.  Throughout my professional career, I have been responsible for teaching training classes in statistical sampling and regression analysis for all levels of practice personnel.  I have published one article about econometric estimation methodology.

4.      I have extensive experience applying economic and statistical theories and methodologies to employment related matters such as discrimination, wrongful termination, and wage and hour cases.  My work in such cases to date has included,

US_ACTIVE-110624481.1
DECLARATION OF STEFAN BOEDEKER
CASE NO.: CV 10-07060 CAS (JCGX)

1   but is not limited to, designing and conducting surveys, time and motion studies,

2   observational studies, statistically analyzing the results of such surveys and studies

3   (my own and other experts' studies), applying statistical sampling methodologies to

4   extrapolate results from a subset to a universe of individuals, developing statistical

5   models and tests to answer liability questions, applying economic theory to develop

6   damages scenarios, and analyzing large employment related databases. I have issued

7   expert reports and rebuttal reports, I have been deposed and I have testified in

8   employment discrimination and employment wage and hour cases.

9      5.    I was retained by Defendant RadioShack Corporation ("RadioShack"), in

10   the matter of *Ordonez et al. v. RadioShack Corporation*. All of the facts and

11   circumstances set forth in this report are known to me personally and I could and

12   would testify competently to them if called to do so. I reserve the right to modify my

13   opinion if additional documents and/or data become available to me or if additional

14   information is provided to me.

15      6.    I was asked by counsel for RadioShack to provide my expert opinions in

16   the above matter related to class certification issues. For this purpose I have reviewed

17   case specific documents and data files described in more detail below. More

18   particularly, I was asked to perform statistical analyses of time clock data for Sales

19   Associates in a sample of randomly selected California stores, declarations of nine

20   current and former employees, and time clock data for the named Plaintiff Daniel

21   Ordonez. My analysis focused on class certification issues raised in Plaintiff Daniel

22   Ordonez's motion. I was also asked to offer my expert opinions in rebuttal to the those

23   offered by Plaintiff's expert, Dr. Dwight D. Steward, in his declaration dated July 21,

24   2012.

25      7.    In forming my opinions for this declaration, I have relied on the

26   following:

27        a.     Second Amended Complaint

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    b.    Declaration of Dwight D. Steward, Ph.D, in Support of Plaintiff's Motion

2    for Class Certification

3    c.    Declarations of nine current and former RadioShack employees:

4        i.    Declaration of Diego Lopez

5        ii.    Declaration of Brandon Ruud

6        iii.    Declaration of Belinda Garcia

7        iv.    Declaration of Cecelia Salgado

8        v.    Declaration of Arlene Machado Santiago

9        vi.    Declaration of Willis Lee

10        vii.    Declaration of Dane Macaulay

11        viii.    Declaration of Pavel Petrosyan

12        ix.    Declaration of Isela Peralta

13    d.    RadioShack's edited time clock and earnings data in the following

14    spreadsheets and PDF files, which I believe is the same data

15    provided to Plaintiff's counsel in this case:

16        i.    Deductions.xlsx

17        ii.    Earnings grp 1.xlsx

18        iii.    Earnings grp 2.xlsx

19        iv.    Hours – str grp 1 – for 2007.xlsx

20        v.    Hours – str grp 1 – for 2008.xlsx

21        vi.    Hours – str grp 1 – for 2009.xlsx

22        vii.    Hours – str grp 1 – for 2010.xlsx

23        viii.    Hours – str grp 1 – for 2011.xlsx

24        ix.    Hours – str grp 2 – for 2007.xlsx

25        x.    Hours – str grp 2 – for 2008.xlsx

26        xi.    Hours – str grp 2 – for 2009.xlsx

27        xii.    Hours – str grp 2 – for 2010.xlsx

28        xiii.    Hours – str grp 2 – for 2011.xlsx

US_ACTIVE-110624481.1
DECLARATION OF STEFAN BOEDEKER
CASE NO.: CV 10-07060 CAS (JCGX)

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

xiv.    Putative Class Contact grp 1 grp 2.xlsx

xv.    Taxes.xlsx

xvi.    Time Punches for 01-3010.pdf

xvii.    Time Punches for 01-3988.pdf

8.    In summary, my opinions are as follows:

a.    The time clock data shows a large degree of variation in terms of meal break behavior for each individual employee, across employees within the same store, and across stores.  The high degree of variation strongly indicates that an individualized inquiry on an employee by employee and on a shift by shift basis is necessary to assess whether employees' meal break behavior as recorded in the time clock data actually constitutes a violation of any wage and hour laws as alleged by the Plaintiff.   If companywide policies and procedures of not providing meal breaks or causing late and short meal breaks were in place then it would be expected that individual employees, employees within the same store, and employees across different stores would be similarly affected by such policies and procedures, and the data would be expected to show homogeneous patterns in terms of missed meal breaks, late meal breaks, and/or short meal breaks.   It does not.

b.    The data provided to me cannot be taken at face value to determine when employees actually took meal breaks.  The data does not indicate whether employees who did not record a meal break were working during that time when they should have been on a meal break.  The data also does not reflect why employees did not clock out for a break or the reasons for not taking a break, taking a short break, or taking a late break.

c.    A comparison of the declarations of the nine current and former employees listed above with the actual time clock data indicates that the statements in their declarations are not consistent with the data.

- 5 -

     d.     What the data shows for Plaintiff Daniel Ordonez is not typical as compared to the data for the other employees in the population.

     e.     The declaration of Dr. Steward contains a great deal of superficial data analysis without offering any opinions and/or conclusions that would be relevant to class certification issues.  The conclusion in paragraph 30 of his declaration regarding "representative sampling" and "extrapolation of results" to all employees is fundamentally flawed and is not supported by the data.

## Analysis of Time Clock and Earnings Data

9.     I was provided with time clock data for employees in a sample of 60 stores.  According to Dr. Steward, the stores were selected randomly by him and his staff from a list of 552 stores using the statistical program STATA.  He further states that the randomly-selected stores reflect the distribution of the stores by regions.  For purposes of this declaration I have assumed that the selection of stores was indeed random.

10.     I reviewed the time clock data which contains the time clock punches for all hourly employees in the selected stores from September 15, 2006, to November 11, 2011.  It is my understanding that the time clock data represents the edited time clock punches that were then submitted to payroll.  The data contained time clock punches for 2,617 employees.  I also reviewed earnings data for 2,230 RadioShack employees for pay periods ranging from September 28, 2006, to October 28, 2011.

11.     The earnings data included a data field "job code" which indicated that the data received contained information for Sales Associates as well as Assistant Managers and Managers.  Based on the "job code" field in the earnings data I identified shifts worked by employees with job titles other than Sales Associate and excluded them from my analysis.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

12.     I analyzed the distribution of the length of tenure measured in number of shifts worked.  Approximately 31% of all employees with information in the time clock data worked 30 shifts or less and approximately 50% of all employees worked 70 shifts or less.  About 1.5% of all employees with time clock data worked more than 1,000 shifts.  If there were consistent companywide policies and practices in place that prevented employees from taking meal breaks I would have expected to see a relatively constant distribution of instances of qualifying shifts[1] with no punches for meal breaks.  However, that was not the case, as can be seen in the following two results from my analysis.  In the group of employees with more than 1,000 shifts, there are some employees who worked as few as 8 shifts with no meal break recorded, while there is one employee who did not record a meal break 517 times.  In the group of employees who worked 70 shifts or less, there are some employees whose shifts always had a meal break recorded, while there is one employee who did not record a meal break 49 times.  Similar results hold true for all levels of total number of shifts worked.  A question that the data does not and cannot answer is why, for example, are there employees who never failed to punch in and out for their meal breaks in 70 shifts worked while there is one employee who did not punch out in 49 out of 70 shifts worked.  This high degree of variation observed in the time clock data strongly indicates that individual preferences have been the reason.  Therefore, an individual inquiry would be necessary to explore the reasons for the widely differing time clock usage that may have led to missed punches for meal breaks.

13.     My analysis also indicated a large variation of time clock punches for meal breaks when looking at particular stores and when looking across stores.  For example, store 13074, the store with the highest percentage of shifts with no meal breaks recorded (38.5%), had employees with individual percentages of no meal breaks recorded ranging from 0 to 100%.  In other words, there is at least one employee who always recorded a meal break and there is at least one employee who

---

[1] A qualifying shift for a meal break has to be greater than 5 hours.

US_ACTIVE-110624481.1
DECLARATION OF STEFAN BOEDEKER
CASE NO.: CV 10-07060 CAS (JCGX)

never recorded a meal break.  Store 14494, where only 5.7% of the total shifts in the data showed no recorded meal breaks, has the same range of individual employee percentages (i.e., from 0% to 100%).  If we exclude employees with short employment histories (e.g., those who worked fewer than 70 shifts), we still see large degrees of variability.  In that regard, Store 13074 has an overall percentage of shifts with no meal breaks recorded of 38.5% and individual employee percentages ranging from 0.8% to 87.5%.  Store 13583 had an overall percentage of shifts with no meal breaks recorded of 14.1% (a bit more than one-third of Store 13074), yet individual employee percentages ranged from 1.3% to 79.2%.

14.   I also performed a statistical test to assess whether within a given store there was a correlation between the size of the store in terms of total shifts worked and the number of all qualifying shifts that did not have punches for a meal break.[2]  The test resulted in a statistically insignificant correlation coefficient of 7.9%.  Therefore, the hypothesis that more shifts worked within a store increased the percentage of shifts with no meal breaks recorded is not supported.

15.   The same observations with regard to large degrees of variation by store can be made with respect to possible late and short breaks.[3]  For example, the occurrence of possible late breaks ranged from 2.4% to 23.1% across stores and the occurrence of possible short breaks ranged from 1.1% to 19.8% across stores. Therefore, there was no statistically significant correlation between possible missed breaks, late breaks, and short breaks across stores (i.e., the number of possible missed breaks was not correlated to the number of possible late breaks and the number of possible missed breaks was not correlated to the number of possible short breaks). Moreover, the occurrence of possible late breaks and possible short breaks did not show any statistically significant correlation across stores.  In summary, the evidence

---

[2] A correlation of 100% (-100%) indicates perfect positive (negative) linear correlation.  A correlation coefficient of 0% indicates no linear correlation at all.
[3] In this context a possible late meal break is a break that is recorded after the fifth hour of work and a possible short break is a break with less than 30 minutes recorded.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

derived from the time clock data strongly indicates that there is no companywide policy or practice that would cause a consistent "violation" of meal break rules. Rather, the evidence indicates that individual preferences and individual behavior by employee and by store govern if and when employees take or do not take meal breaks.

16.    My next analysis focused on the length of the meal breaks for those shifts that had a recorded meal break in the time clock data. 32.2% of all shifts with a recorded meal break had a break of exactly 30 minutes. An additional 11.3% of all shifts had recorded breaks between 24 and 29 minutes. 45.1% of all breaks recorded were between 31 and 60 minutes. 2.9% of all meal breaks recorded were over one hour in length and only 8.5% of all breaks recorded were less than 24 minutes (almost 75% of the recorded meal breaks that were less than 24 minutes in length were between 15 and 23 minutes). The overall average of all recorded meal breaks in the time clock data was just over 35 minutes.

17.    Two particular facts presented in paragraph 16 above, (i) 80.2% of all recorded breaks were 30 minutes or more in length, and (ii) the overall average of all recorded breaks was slightly over 35 minutes, clearly indicate employee meal break behavior was fully compliant with wage and hour laws. The fact that there are numerous recorded meal breaks that are longer than 30 minutes also indicates that it was common practice to accommodate employees' needs for occasional longer meal breaks (as is also indicated by the fact that the overall average of all recorded breaks is slightly more than 35 minutes).

18.    In my experience, in the retail sector it is quite common that sales employees return from their meal breaks a couple of minutes early simply because it is difficult for them to time the break at exactly 30 minutes. In other words, rather than being late, an employee may opt to return a couple of minutes early. This individual preference for not being late may be the reason why in the data there are numerous recorded breaks that are between 24 and 29 minutes in length. In my experience, it is also quite common in the retail sector that commission plans provide additional

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

income opportunities for sales people. It is my understanding that RadioShack pays commissions to Sales Associates. Only through individual inquiry on an employee by employee basis would it be possible to determine whether a Sales Associate missed a meal break or recorded a short or late meal break because he or she was in the process of closing a sale which could result in a commission and did not want to interrupt the sales process with a customer just to go for a meal break, particularly if the sales process occurred around the end of the fifth hour of work.

19.    I conducted an analysis of the shifts that had no meal break punches in the time clock data by comparing them to the length of the shifts.[4]  50% of the shifts that had no recorded meal breaks were between 5 and 6 hours in length and 22% were between 6 and 7 hours in length. The high concentration of shifts with no meal break punches among the shifts between 5 and 7 hours may indicate an employee's preference to have worked the shift without taking a break. For example, an employee who was scheduled to work a six hour shift may have preferred to work the six hours without taking a break rather than clocking out after five hours, taking a half hour break, and then returning to work for the remaining hour. Without further inquiry on an employee by employee basis, it cannot be concluded that a meal break not recorded in the data automatically constitutes a violation or whether the employee voluntarily chose not to take the meal break.

20.    The analyses described in the preceding paragraphs highlight the fact that taking the data at face value may lead to erroneous conclusions. In addition, there is no evidence in the data that there was a company policy or practice that forced employees not to take meal breaks. It is also not apparent whether the work flow in the stores was such that there were no opportunities to have a meal break.

21.    It is my understanding that Plaintiff alleges that RadioShack had a company policy that discouraged or prohibited overtime. In order to assess that

---

[4] For this analysis, I included only shifts that were eligible for a meal break (i.e., those greater than 5 hours).

allegation, I performed an analysis of the shift lengths. The mean and the median length of all shifts worked are 6.1 and 6.3 hours respectively. Approximately 28.7% of all shifts in the data are five hours or less. Approximately 60.9% of all shifts are greater than 5 or less than or equal to 8 hours and approximately 10.4% of all shifts are more than 8 hours in length. In those situations where overtime and/or double time hours were recorded, the hours were paid at the appropriate premium rates. Overtime was paid in approximately 10.4% of all shifts worked by Sales Associates and double time was paid in approximately 2.4% of all shifts worked. In shifts where overtime was recorded, the average amount of overtime worked was approximately 50 minutes.

## Analysis of Declarations of Individual Employees and Their Time Clock Data

22.     Before I present the results of my analysis pertaining to the employees who signed declarations in support of the motion for class certification, I want to point out that this analysis is based on the data that I had available. The time clock data and the earnings data only go up to November 2011 and October 2011, respectfully. I analyzed the declarations for two main purposes: a) They provide further evidence for the large variation of meal break behavior across the declarants, and thus highlight the need for individual inquiry in this case, and b) they clearly indicate the problems associated with individuals relying on their memory to answer detailed quantitative questions that relate to events that occurred many years in the past.

23.     For example, according to his declaration, Mr. Brandon Ruud worked as a Sales Associate at three different RadioShack stores from October 2005 to May 2010. I reviewed the time clock data that covered part of his tenure at the second store and all of his tenure at the third store. I did not have data for his tenure at the first store. Mr. Ruud claims that during the holiday seasons he was frequently not provided meal breaks, that his meals breaks were frequently interrupted, and that he

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    almost always received his meal breaks after he had already worked 5.5 hours.

2    However, the data for Mr. Ruud does not support his assertions. According to the

3    data, Mr. Ruud worked 539 shifts.[5] Out of those shifts, 100 were 5 hours or less and

4    436 were longer than 5 hours but less than 10 hours. There were also 3 shifts where

5    he worked 10 hours or more. In total, Mr. Ruud clocked out for 369 meal breaks

6    averaging 34.5 minutes – over 68% of those meal breaks were 30 minutes or longer.

7    The data for Mr. Ruud further indicates that there were 113 instances of possible short

8    meal breaks, 97 of which were between 24 and 29 minutes in length and only 16 were

9    less than 24 minutes. The data further indicates that there were 32 instances of

10    possible late meals that were 30 minutes or more and 17 possible late meals that were

11    less than 30 minutes. In conclusion, the statements in Mr. Ruud's declaration are not

12    supported by the data.

13       24.     Mr. Dane Macaulay states in his declaration that "I regularly worked

14    shifts over 6 hours in length five to six times per week. With respect to these shifts, I

15    was not provided with a meal break 1 to 5 times a month." Mr. Macaulay states he

16    was employed as a Sales Associate from October 2010 to June 2011. This time period

17    falls entirely within the time period for which time clock data was made available to

18    me. According to the data, Mr. Macaulay worked 28 shifts. There is a major

19    discrepancy between Mr. Macaulay's recollection of his tenure at RadioShack and

20    what the data shows in terms how many shifts he worked, but I will leave that aside

21    for now. Out of Mr. Macaulay's 28 shifts in the data, 5 were 5 hours or less and 23

22    were longer than 5 hours but less than 10 hours. Only 5 shifts indicated no time

23    punches for a meal break and the shifts where he punched out for a meal indicated an

24    average meal break length of over 51 minutes. There was one possible late meal

25    break. In summary, the statements in Mr. Macaulay's declaration are not supported

26    by the data.

27

28    [5] For the purposes of discussing individual declarants, I exclude work days that are holidays,
vacation days, excused days, etc.

- 12 -

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

25.     Mr. Willis Lee states in his declaration that "Approximately once per week, I was not provided with a meal break during my shift, even though I was working a shift that was about 8 hours long."  Mr. Lee's employment as a Sales Associate falls entirely within the time period for which time clock data was made available to me.  According to the data, Mr. Lee worked 179 shifts.  Out of those shifts, 34 were 5 hours or less and 145 were longer than 5 hours but less than 10 hours.  Only 6 shifts longer than 5 hours had no time punches for a meal break.  In total, Mr. Lee clocked out for 132 meal breaks averaging 30.1 minutes.  The data further indicates that there were 64 instances of possible short meals, 57 of which were between 24 and 29 minutes in length and only 7 were less than 24 minutes.  Mr. Lee worked as a Sales Associate in two stores between March 2008 and January 2009.  Assuming that he worked as a Sales Associate for 10 months, which is approximately equal to 43 weeks, based on his declaration testimony, I would have expected to see approximately 43 missed meal breaks ("once a week") but there were only 6 recorded in the data.  There were also only 7 instances of short breaks with less than 24 minutes.  In summary, the statements in Mr. Lee's declaration are not supported by the data.

**Analysis of Plaintiff's Time Clock Data**

26.     The time clock data contained 535 entries for Plaintiff Daniel Ordonez.  21 of those were labeled as "Holiday," "Vacation," "Excused," etc., leaving 514 shifts which I analyzed.  Mr. Ordonez worked 514 shifts.  This places him into the group of what I consider to be long-tenured employees.  (Only 11.2% of all employees in the data worked more shifts than Mr. Ordonez.)

27.     In contrast to Plaintiff's lengthy tenure as compared to other employees in the data, the length of his shifts indicates a significantly lower average amount of time worked than the other employees in the data.   68.7% of his shifts were 5 hours or

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

less (i.e., in over two thirds of his shifts, Mr. Ordonez was not eligible for a meal break), 29% were between 5 and 8 hours, and 2.3% of his shifts were greater than 8 hours. By comparison, across all employees in the data, the percentages were 27.5%, 61.8%, and 10.7% respectively.

28.     While the overall mean and median shift length for all employees in the data is 6.1 and 6.3 hours respectively, Mr. Ordonez's mean and median shift length was only 4.5 and 4.2 hours, respectively. His time clock data indicates 66 shifts over 5 hours in length where no meal breaks were recorded. There are 22 instances of shifts under 5 hours in length where a meal break was recorded. Out of 119 shifts of over 5 hours in length with meal breaks recorded, 105 were 30 minutes or longer with an average break length of 44 minutes.

29.     Mr. Ordonez's meal break punches may have been influenced by the times of day when his shifts started. Almost 83% of his shifts started after 2:30 p.m. and almost 56% of all his shifts started at 5:00 p.m. or later. The relatively late start times of his shifts may have had a significant impact on his meal break behavior in those few instances when he did not clock out for meal breaks.

30.     In summary, it is my opinion that Mr. Ordonez's work experience was not typical as compared to the other employees in the data. His tenure in terms of total shifts worked is significantly higher while his actual hours worked are significantly lower than those of the employees in the data group. He also started most of his shifts in the mid or late afternoon, which is atypical. In addition, the time clock data indicates that besides having missed meal punches, he punched out for meals when he was not eligible, and that when he was eligible for a meal break, the average time of his recorded breaks significantly exceeded 30 minutes.

## Analysis of Dr. Steward's Declaration

31.     In his declaration, Dr. Steward describes the results of his analysis of RadioShack's time and pay records. He concludes that the data "evidences a

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  substantial number of instances of missed, short, and late meal periods."[6]  He then

2  continues to report several summary statistics which reveal "that sales associates had

3  either a missed, short, or late meal period."[7]  It has to be pointed out that the time

4  clock data Dr. Steward analyzed seems to be the same data which I analyzed.  The

5  data contains information of time clock punches of individual employees on a shift by

6  shift basis.  Based only on recorded time punches or the lack of time punches, Dr.

7  Steward makes conclusions about "instances of missed, short, and late meal periods."

8  However, the lack of time punches does not necessarily signify meal breaks were

9  missed.  It is possible that a meal break was taken – on time and for the proper

10  duration – but simply not properly recorded by the employee or his manager.  The

11  data does not contain any information about the reasons for the time punches recorded

12  or any reasons for the lack of time punches.  Just looking at the data, it is impossible

13  to ascertain whether a meal period was not provided by RadioShack, whether it was

14  an employee's voluntary choice not to take a meal period, or whether a meal break

15  simply was taken but not recorded.

16      32.      When describing his analyses, Dr. Steward states that, "In this report, I

17  have performed three different meal period analyses for potential meal period

18  violations, namely analyses for 'missed' meal periods, 'short' meal periods, and 'late'

19  meal periods.'"[8]  Dr. Steward then seems to concede that the purpose of his analyses

20  of missed, short, and late meal periods in the data is to identify "potential" meal break

21  violations.  If so, I agree with this interpretation of the data – the fact that the time

22  clock data for an individual employee's shift does not contain time punches for a meal

23  break indicates, at most, that the particular shift may be a candidate for a potential

24  meal break violation.  As I have pointed out in the paragraphs above, the next step in

25  the analysis would be to do a shift by shift analysis based on individual inquiries of

26  employees to determine whether a potential meal break violation in fact was the result

27  ――――――――――――
[6] Steward Declaration, Paragraph 5
[7] Ibid.
28  [8] Steward Declaration, Paragraph 11

US_ACTIVE-110624481.1
DECLARATION OF STEFAN BOEDEKER
CASE NO.: CV 10-07060 CAS (JCGX)

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

of the employee not being provided a break.  However, Dr. Steward has not performed that analysis, but still presents a number of tables which are all titled "Meal Period Violations".[9]

33.    Throughout his declaration, Dr. Steward reports summary statistics based on his analyses of all Sales Associates and all shifts.  For example, in paragraph 17 of his declaration, he states that 25% of all shifts analyzed had occurrences of missed meal periods.  Let us assume for a moment that 25% is the correct number for shifts with no time punches for meal breaks in the time clock data.  Based solely on this number, it is still impossible to conclude that 25% of all shifts do, in fact, constitute meal period violations.  At most, the identified occurrences of missed time punches for meal breaks indicate *potential* meal break violations.  His summary statistics also hide the large degree of variation in the individual employees' time clock behavior.  As reported above, there are employees with no missed time punches and there are employees with a large number of missed time punches even within the same store.  However, Dr. Steward does not address the fact that there is no uniform trend in the time clock data.

34.    In the last paragraph of his declaration, Dr. Steward draws the conclusion that "a representative sampling and survey of the class members can be used to reliably determine the amount of off-the-clock work, as well as the number of rest breaks and meal periods that were missed or otherwise interrupted."[10]   It is entirely unclear to what he means.  I do not know, for example, whether he proposes to select a representative sample of employees, in addition to the employees in the random sample of stores he analyzed in his declaration, and then perform a survey of those selected employees by presenting them with a questionnaire asking about their experience with respect to meal periods, rest breaks, and off-the-clock work during their employment at RadioShack.  Such a survey would require the selected

---

[9] Steward Declaration, Pages 5, 6, 7, 9, 10, 11, and 13
[10] Steward Declaration, Paragraph 30

employees to make quantitative statements based on their memory and recollection about events which, in many instances, are many years in the past.  Such quantitative statements would be at best "guestimates" or inherently imprecise (e.g., in his declaration, Dane Macaulay indicated that he missed 1 to 5 meal breaks per month - Dr. Steward does not suggest a statistical methodology for how to treat imprecise responses like this).  At this time I do not believe a survey of representative employees could yield reliable answers which could then be extrapolated to the entire putative class.

35.    Dr. Steward further states that, "The findings from the representative sample can be extrapolated to the universe of RadioShack employees to determine overall wage and hour violation rates and economic damages."[11]  Does the fact that Dr. Steward references "the findings from the representative sample" indicate that a sample has already been selected?  I cannot answer that question from his declaration. Furthermore, I do not believe the results from a representative sample could be extrapolated to an underlying universe (in this case, the underlying universe is all RadioShack Sales Associates in California stores) with a statistical confidence level and a margin of error or precision level which would be necessary to evaluate the reliability of a sample.  Generally, a sample that is used to extrapolate reliably to a universe would have to be a statistically valid random sample with a high degree of confidence (e.g., 95%) and a small margin of error (e.g., $\pm 10\%$).

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.  Executed on September 20th, 2012, at Los Angeles, California.

<br>

_____
Stefan Boedeker

---
[11] Ibid.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

US_ACTIVE-110624481.1
DECLARATION OF STEFAN BOEDEKER
CASE NO.: CV 10-07060 CAS (JCGX)

# EXHIBIT A



**Stefan Boedeker**

Director

Berkeley Research Group

550 South Hope Street
Suite #2150
Los Angeles, CA 90071
Tel: (310) 499-4924
Cell: (213) 705-1324

Email: sboedeker@brg-expert.com

**Education**
- BS in Statistics, University of Dortmund, Germany
- BA in Business Administration, University of Dortmund, Germany
- MS in Statistics, University of Dortmund, Germany
- MA in Economics, University of California, San Diego
- Met Ph.D. requirements except dissertation in Economics, University of California, San Diego

**Professional Associations**
- Member of the American Economic Association (AEA)
- Member of the American Statistical Association (ASA)
- Member of the Econometric Society
- Member of the Mathematical Association of America (MAA)
- In 2001 Stefan was a member of an AICPA task force dealing with Corporate Integrity Agreements (CIA).  Stefan was responsible for issues related to statistical methodology utilized in CIA's.

# Stefan Boedeker

Stefan is a Director at Berkeley Research Group where he focuses on the application of economic, statistical, and financial models to a variety of areas such as solutions to business issues, complex litigation cases, and economic impact studies.  He has extensive experience applying economic and statistical theories and methodologies to employment related matters such as discrimination, wrongful termination, and wage and hour cases.  His work in such cases to date has included, but is not limited to, designing and conducting surveys, time and motion studies, observational studies, statistically analyzing the results of such surveys and studies (his own and other experts' studies), applying statistical sampling methodologies to extrapolate results from a subset to a universe of individuals, developing statistical models and tests to answer liability questions, applying economic theory to develop damages scenarios, and analyzing large employment related databases.

## Professional and Business Experience

## Representative Engagements

## Employment Litigation

### WAGE AND HOUR

»      For a computer equipment leasing company Stefan utilized statistical models to estimate exposure due to alleged forfeiture of unpaid vacation time.

»      For a limousine company Stefan developed a statistical sampling based exposure model to quantify the impact of alleged unpaid overtime.

»      In several cases involving 12 hour shift workers at hospitals Stefan performed rebuttal analyses of plaintiff's damages computations.

»      For a large electronic retail chain Stefan calculated exposure based on the failure of paying overtime for store managers.

»   For a major department store Stefan performed a statistical analysis of manager surveys where he found significant differences in the managers' allocation of time across department and stores. Ultimately, due to these differences a class was not certified.

»   For a large sporting goods retail chain Stefan assisted in defining the size of the potential class and in estimating the potential exposure which led to a favorable, early settlement of the case.

»   For a women's shoes retail chain Stefan designed and statistically analyzed an observational study to quantify the amount of time spent on exempt versus non-exempt tasks.

»   For a video rental store chain Stefan developed sampling algorithms based on in-store security cameras to analyze time spent by assistant managers on exempt versus non-exempt activities.

»   For a large fast food chain Stefan directed a team collecting employee work information from restaurant locations in order to monitor and gain compliance in response to litigation

»   For a large mass merchandiser Stefan developed a document and data reconciliation tool and he developed a statistical sampling mechanism to proof compliance with a court ordered document retention procedures in the course of a wage and hour litigation.

»   Stefan worked with a Fortune 500 bank in a class action suit to review the claims of managers that were misclassified and should have been paid overtime.  To compute damages, Stefan reviewed the overtime records of employees in this position prior to a job classification change and, in the absence of overtime data after the job classification change, Stefan reviewed sign in and sign out times of the office building.

»   For a long-term care provider Stefan used data from timesheets, payroll, and other scheduling records to create comprehensive reports showing potential exposure for each of the claimed areas:  timely wage payment, overtime wage payment, adequate daily meal and rest break periods, and travel time compensation.

»   For a maternity clothing store chain Stefan performed analyses related to exempt/non-exempt status issues for managers and assistant managers.  Stefan also conducted a break time analysis for all employees.

»   For a commercial flooring contractor Stefan assessed the job duties and responsibilities of a group of supervisors.  During the engagement, the scope of work expanded to include an analysis of misclassification and back-pay exposure for additional groups of employees.

»   For a software developer Stefan analyzed how department and project specific characteristics impacted the work flow and the correlation of that impact to certain exemptions.

»   For a large meatpacker Stefan conducted a time and motion study to properly assess the duration of certain separately compensated activities to rebut allegations of violation of minimum wage laws.

»   For a public university housing department Stefan conducted an extensive time and motion study to identify the tasks (and associated time range to perform each task) related to processing a contract cancellation.

» For a large drugstore chain Stefan used in-store cameras for the smaller stores and actual in-store observations for the larger stores to conduct a time motion study and quantify the time spent by assistant managers on certain pre-defined tasks.

» For a large public storage company Stefan conducted a detailed time and motion study to determine the cost of collection and administration of late payments.  Using both self-logging and independent review techniques, Stefan defined each step in the late payment process, calculated the cost to the company for such activities, and compared this cost to the late fees under dispute.

» For a large retail store chain Stefan performed statistical analyses of regularly conducted employee activity surveys.

» For a mass merchandiser, Stefan conducted an observational study of activities of all individuals classified as managers to show significant differences in daily activities.

» For a department store, Stefan conducted an in-store observational study of managers and assistance managers to assess the percentage of time spent on managerial tasks.

» For a state ferry system in the Pacific Northwest, Stefan conducted an observational study of engine room personnel during shift changes to quantify potentially unpaid time worked.

» For a large retail chain Stefan conducted an extensive analysis of the company's compliance with break time rules and regulations and also the employees' usage and potential abuse of break time.

» For a large mass merchandise retailer Stefan compiled a comprehensive database of punch clock data, payroll data, point of sales data, hardcopy information about manual edits of time entries, store security system data, etc. to analyze allegations of inserting breaks, deleting time and forcing employees to work after they clocked out.

» For a large electronic retail chain Stefan analyzed time card data, point of sales data and other store specific attributes to quantify potentially missed meal and rest breaks.

## DISCRIMINATION, WRONGFUL TERMINATION

» For a large telecommunications company, Stefan provided a rebuttal analysis of plaintiffs' expert's damages analysis in a multi-plaintiff action alleging wrongful termination and age discrimination.  Stefan also developed alternative damages scenarios and addressed questions of liability.

» In an OFCCP investigation alleging discriminatory hiring practices at several food processing plants, Stefan constructed employment databases and performed statistical analyses to address the allegations.

» In a gender discrimination case involving a client in the food processing industry, Stefan analyzed the impact of the implementation of an Affirmative Action Plan on the allegedly discriminatory employment practices.

» In a wrongful termination case alleging age discrimination for a vegetable seed company, Stefan performed rebuttal work of the plaintiff's expert's liability and damages analysis.

» In a wrongful termination case alleging age discrimination for a major aerospace company, Stefan performed statistical analyses to rebut allegations of age discrimination.

» In a class action race discrimination suit against the Alabama Department of Transportation, Stefan developed statistical regression models and tests to analyze the alleged discrimination.

» In a class action gender discrimination case against a large real estate brokerage firm, Stefan provided deposition testimony to class certification issues.

» In a wrongful termination dispute of a regional property manager, Stefan utilized economic and statistical models to assess the allegations of economic loss due to the separation of employment.

» In a gender discrimination case against a temporary employment agency, Stefan performed econometric analyses to disprove salary discrimination against two former female employees. Stefan addressed plaintiffs' expert's damages calculations and developed alternative scenarios.

» In a case involving a job lottery for dock workers, Stefan performed a statistical analysis of the process showing that the lottery did not create a disparate impact.

» For a large meat processing plant, Stefan performed statistical analyses of employment data to address allegations of discriminatory hiring practices.

## Other Disputes

➢ In numerous investigations about alleged stock option backdating Stefan developed and applied statistical methods analyzing financial data to evaluate the allegations. He also applied statistical sampling methodology in these cases.

➢ For a prestigious national not-for-profit organization, completed commissioned study to examine the actual trading activity of a number of diversified investors and compare it to alleged market price effects of claimed securities fraud (asserted in complaints) in order to determine the net impact of the particular diversified investors. Based on the study, made inferences about the impact on the broader community of diversified investors to determine to what extent shareholders in fact are paying themselves in class action settlements.

➢ For a leading publicly-traded developer of enterprise management software, employed statistical approach to demonstrate the diversity of investment styles among proposed lead plaintiffs for a securities class action lawsuit alleging section 10b-5 violations and other claims. Employed an econometric approach to estimate potential damages for each lead plaintiff.

➢ For a leading publicly-traded developer of enterprise management software, Stefan employed econometric time-series model to analyze allegations of insider trading and the timing of certain stock transactions relative to information available to officers in the company.

➢ For a shareholder derivative action against a leading publicly-traded health care provider, employed an econometric approach to quantify potential damages per share due to alleged section 10b-5 violations and other claims. For the same matter, developed a multi-trader model to estimate the number of shares potentially damaged.

➢ For a publicly-traded manufacturer of office supplies, developed a Black-Scholes application and utilized a binomial distribution probability methodology to evaluate the appropriateness of the size of a loan loss reserve related to a loan collateralized by the assets of an employee stock purchase plan.

➢ For a large software developer, Stefan performed statistical modeling to assist in a securities class action litigation involving allegations of improper revenue recognition, reserve allocations, financial statement disclosures and other accounting irregularities

➢ For a failed computer hardware company in defense of a 10b-5 securities litigation action, Stefan performed statistical analyses of accounting transactions, inventory and receivable reserves and the auditor's work papers in its evaluation of the allegations.

➢ In several Rule 10b(5) class actions, Stefan used the event study approach to calculate the value line of a security.  In these cases Stefan applied complex and advanced one, two, and multi-trader models.

➢ When heading up the Economics and Statistical consulting group at a Big Five Accounting Firm, Stefan directed numerous engagements in quantifying exposure in securities litigation cases where wrongdoing of the auditor was alleged.

➢ For a patent infringement case on industrial orbital sanders, Stefan analyzed scenarios based on economic demand models and price elasticity calculations to determine past and future lost profits as well as price erosion.

➢ In a copyright infringement case of used car evaluation guides, Stefan specified and estimated linear and non-linear regression models to determine the effect of the infringement of the copyright on sales over time.

➢ In a merger of two warehouse chains, Stefan specified statistical tests and regression models to explain differences in inventory shortages.

➢ In a natural resource damage case, Stefan provided econometric analysis of property value loss due to proximity to a solid waste site utilizing hedonic regression models.

➢ In a natural resource damage case, Stefan provided econometric analysis of property value loss due to proximity to a polluted river utilizing hedonic regression models.

➢ For a case involving potential damage from a landfill in a state park, Stefan analyzed data about travel, tourism and park attendance. Stefan specified and estimated linear regression models and time series models to predict park attendance.

➢ For a large U.S. food and beverage company, Stefan worked on an evaluation of intangible assets based on an econometric model comparing the demand of branded and private label products.

> In a dispute over decline in returns for soybean futures, Stefan specified statistical models to predict cumulative returns.

> In a class action case involving alleged diminution of property values due to ground-water contamination, Stefan specified and estimated hedonic regression models to show that other factors than the contamination contributed significantly to the loss in property value.

> For a patent infringement case on micro-motors, Stefan analyzed data of production and sales of goods that contain micro-motors and ran econometric regressions to determine price erosion.

> For a film production company, Stefan specified statistical models to quantify the loss in expected box office revenue due to the breach of contract by a celebrity.

> In a dispute between a union and a meatpacker over violation of state law with respect to fixed allowances for certain compensable activities, Stefan analyzed the union's damage claim and conducted an activity timing analysis.

> Stefan designed and administered large-scale databases to reconstruct accounting records of a large financial institution's Corporate Trust Department. He developed statistical models to analyze bondholders' presentment behavior of Bearer bonds.

> In a dispute between the Department of Interior and individual Native Americans over mismanagement of individual trust accounts, Stefan performed a statistical analysis of an electronic database with approximately 60 million records in order to draw a statistically valid sample of accounts for further analysis.

> In a trademark infringement case of video equipment, Stefan calculated damages based on the defendant's unjust enrichment utilizing statistical time trend models.

> For a major chemical company involved in a personal injury case, Stefan created and maintained a database containing damage award data about chemical industries. Stefan also specified pooled cross-sectional/time-series regression models to analyze the effects of punitive damage awards on job safety and new capital expenditure.

> For a breach of contract case involving a production company over failed financing for a film, Stefan analyzed cost and revenue figures and estimated regression models to predict foreign box office revenues.

> For a major healthcare provider involved in a dispute with a potential class of more than 3,000 other providers over allegedly excessive outlier payments Stefan performed economic and statistical analyses. Ultimately, class certification was denied in that case.

> For a large homecare product provider involved in a Qui Tam investigation, Stefan analyzed and rebutted the Government's expert's statistical approach to extrapolating error frequencies and potential damages.

> For a large chain of healthcare services provider involved in a corporate fraud investigation, Stefan developed statistical models to assess how the corporate fraud may have affected payments under the federally funded healthcare reimbursement programs.

- For a shareholder derivative action against a leading publicly-traded health care provider, employed an econometric approach to quantify potential damages per share due to alleged section 10b-5 violations and other claims. For the same matter, developed a multi-trader model to estimate the number of shares potentially damaged.

- For a large chain of healthcare services provider involved in a corporate fraud investigation, Stefan developed statistical models in junction with a DOJ hired expert statistician to quantify potential overpayments through the cost report system which was tainted by the corporate fraud.

- For a major health care provider involved in a large scale DOJ investigation, Stefan developed statistical sampling models and negotiated their application in an eight year corporate integrity agreement with the OIG.

- For a State Department of Health and Social Services, Stefan quantified the damages caused by a system error in the State's Medicaid eligibility processing system.

- For a large homecare product provider involved in a Qui Tam investigation, Stefan developed alternative stratified sampling models to address allegations of fraudulent billing practices.

- For a State Department of Health and Social Services, Stefan developed a simulation study to assess the impact of an insurer's plans of changing its status to for-profit.

- In a provider's OIG self-disclosure relating to CPT coding issues, Stefan conducted statistical sampling reviews to prove that the errors were random in nature and did not constitute fraud.

- For a major health care provider, Stefan developed statistical methods to assess the exposure in a DOJ investigation related to cost report reserve issues.

- For a state's psychiatric hospitals, Stefan developed the statistical methodology in a billing dispute with HCFA about potential charge and billing problems.

- In a variety of cases, Stefan designed statistical random samples for an HMO to test the validity and reliability of electronic databases in a billing dispute with HCFA (now CMS).

- In a variety of cases, Stefan assisted clients in the use of the Government approved statistical program RatStat to perform probe samples and the necessary extrapolations of repayments due to the Government in Medicare reimbursements disputes.

- For several County owned hospitals in San Diego County, Stefan conducted the statistical analysis for a self disclosure, and presented the results to the regional OIG office in Santa Ana, CA.

- In a dispute between a major health care provider and private payor groups, Stefan developed statistical stratified sampling models to assess exposure across different contract types.

➤ For a project analyzing data of billing overcharges of a chain of psychiatric hospitals, Stefan worked on a sample design and the estimation of the total amount of overcharges based on the sample.

➤ For a large healthcare corporation involved in the breast implant litigation, Stefan specified and estimated statistical models to quantify the expected contribution to a combined settlement pool.  He also quantified potential liability in individual law suits by analyzing company specific production and profitability data combined with a study of the correlation between compensatory and punitive damages in similar law suits.

➤ For a major health care provider, Stefan developed statistical sampling plans in the area of Home Health Care to assess the exposure in a DOJ investigation regarding medical necessity issues.

➤ For a major health care provider, Stefan developed statistical sampling models and predictive models to answer questions about irregularities of Lab billings.

➤ For the Los Angeles County Department of Health Services, Stefan conducted a time and motion study to determine the time required to complete specific Medi-Cal eligibility and provider forms.

➤ For the Los Angeles County Department of Health Services, Stefan developed a database tool to capture the time spent on specific Medi-Cal eligibility and provider tasks.

➤ For a large financial institution's personal trust department, Stefan designed a random sample to estimate the potential exposure due to fee overcharges.

➤ For a major long distance carrier, Stefan developed a stratified random sample design to estimate the amount of disputed charge backs from a service provider.

➤ In a dispute between a major long distance carrier and some of its supply vendors about overcharges on invoices, Stefan developed stratified random sample designs to quantify the overcharges.

➤ For a project analyzing the extent of competition in the market segments of a pipeline company, Stefan analyzed price indices.

➤ In an antitrust case involving high volume copiers, Stefan estimated the divisional cost of capital directly from divisional accounting time series using the capital asset pricing model.

➤ In a major municipal bankruptcy, Stefan performed an analysis of financial time series data of yields and cost of borrowing for the portfolio and selected subsets thereof. He also developed statistical forecast models based on the pre-bankruptcy portfolio to predict interest earnings and expenses as well as daily cash flows for the post-bankruptcy period.

➤ In a variety of cases, Stefan designed statistical random samples for HMO's to test the validity and reliability of electronic databases containing patient information.  In a large variety of cases, Stefan rebutted expert reports utilizing economic theory or statistical techniques, in particular economic demand models, regression models and statistical sampling methods.

## Non-Disputes

- For the American Film Marketing Association, Stefan performed an economic impact study of the influence of the independent film producers and distributors on the U.S. economy in general, and the California economy in particular.

- For a large entertainment client, Stefan developed statistical models to predict the return of video cassettes and DVDs.

- For several clients in the retail industry, Stefan developed statistical models to estimate the liability of unredeemed gift certificates.

- For a client in the restaurant business, Stefan developed statistical models to quantify the dollar amount of outstanding unredeemed gift certificates.

- For a major hotel chain, Stefan developed statistical models to forecast the redemption of frequent traveler program points for tax purposes.

- For a high profile e-commerce company, Stefan's team produced an interactive Business decision tool to forecast company growth and profitability. The interactive model allows the client, through the choice of a few fundamental inputs, to measure the simultaneous impact on all cost and revenue dimensions of the company, including real estate and equity participation.

- For the Nevada Resort Association, Stefan quantified the economic impact of the gaming industry with special emphasis on the accelerated population growth in greater Las Vegas.

- For the Los Angeles Unified School District, Stefan performed an economic study about the impact of different recycling programs.

- For the Los Angeles County Department of Health Services, Stefan conducted a time and motion study to determine the time required to complete specific Medi-Cal eligibility and provider forms.

- For the Arizona Tax Research Association, Stefan developed economic models to quantify the revenue impact of a proposed change of taxation in the construction sector in Arizona.

- For a hotel property management company, Stefan analyzed customer data, and used data mining methods to develop predictive models for customer acquisition, retention, and attrition.

- For a project analyzing the extent of competition in the market segments of a pipeline company, Stefan estimated regression and Tobit-models to determine optimal bidding behavior for gas storage demand. He prepared testimony given in filings before the Federal Energy Regulatory Commission (FERC).

- For large grocery store chains, Stefan analyzed the effectiveness of a frequent shopper card program utilizing data mining techniques. He also analyzed customer data to facilitate the introduction of one-to-one marketing tools.

> For a hotel property management company, Stefan developed a demand driven yield management system.

> For a company providing self storage space, Stefan developed a demand driven price-setting strategy utilizing own- and cross-price elasticity regression models.

> For a high-tech start-up with a unique service offering of new products, Stefan recommended product-pricing scenarios.

> For a large international conglomerate, Stefan developed customized data mining techniques for the implementation within a customer knowledge management system.

> For a large law firm, Stefan performed a comprehensive statistical analysis of Los Angeles superior court jury verdicts over the last decade. The project tested the hypothesis of systematic bias in particular courthouses with respect to plaintiff-win probability, length of trial, length of deliberation, and dollar amounts awarded.

# DEPOSITIONS & TESTIMONY

## Depositions

> MRO Communications, Inc vs. American Telephone and Telegraph Company, United States District Court District of Nevada, Case. No. -5-95-903-PMP, Deposition Testimony, September 26, 1996

> Yolanda Aiello Harris, individually and on behalf of all others similarly situated; Jennifer Hopkins, individually and on behalf of others similarly situated; Shannon L. Bradley, individually and on behalf of others similarly situated, Plaintiffs, vs. CB Richard Ellis, Inc., a California corporation; CB Commercial INC., a California corporation; Defendants, Superior Court of California, County of San Diego, Case No. GIC 745044, Deposition Testimony, January 05, 2001.

> State of Tennessee, ex rel., Douglas Sizemore, Petitioner vs. Xantus Healthplan of Tennessee, Inc., Chancery Court of Davidson County, Tennessee at Nashville, Case No 99-917-II, Deposition Testimony, October 11, 2001.

> Howard Wright, Inc., a California corporation doing business as AppleOne Employment Services, Plaintiffs, vs. Olsen Staffing Services, Inc., a Delaware Corporation, Dagney Smith, an individual, Vicky Riechers, an individual, and Linda Shiftman, an individual, Defendants, Superior Court of the State of California for the County of Los Angeles, Case No. BC 200657, Deposition Testimony, December 7, 2001.

> Sacred Heart Medical Center, et al., Plaintiffs, -vs- Department of Social and Health Services, and Dennis Braddock, the Secretary of the Department of Social and Health Services, Defendants, Superior Court of the State of Washington in and for the County of Thurston, No. 00-2-01898-1, Deposition Testimony, January 23, 2003.

> Patrick Bjorkquist individually and on behalf of all others similarly situated, Plaintiff, vs. Farmers Insurance Company of Washington, Defendant, in the Superior Court of the State of Washington for King County, Case No.: 02-2-11684-1 SEA, Deposition Testimony, November 3, 2003.

> Diversified Property, a general partnership, Dora Saikhon Family Trust, and Nancy Saikhon Borrelli, an individual, Plaintiffs vs. Manufacturers Life Insurance (U.S.A.), a Michigan corporation, erroneously sued as Manufacturers Life Insurance Company, Inc., Defendants in the Superior Court of California, County of San Diego, Case No.: GIC 815128, Deposition Testimony on July 21, 2004.

> Alan Powers, Plaintiff, vs. Laramar Group et al., Defendants in the United States District Court, Northern District of California, No. C-02-3755 SBA, Deposition Testimony on August 27, 2004.

> Group Anesthesia Services, A Medical Group, Inc., Claimant, vs. American Medical Partners of North Carolina, Inc., etc., et al., Respondents, JAMS Arbitration, Reference No. 1100040919, Deposition Testimony on February 9, 2005.

> Group Anesthesia Services, A Medical Group, Inc., Claimant, vs. American Medical Partners of North Carolina, Inc., etc., et al., Respondents, JAMS Arbitration, Reference No. 1100040919, Deposition Testimony on March 11, 2005.

> Fujitsu v. Cirrus Logic et al., United States District Court, Northern District of California, San Jose Division, Case No. 02CV01627.  Deposition Testimony on April 21,22, 2005.

> Goldman et al. v. RadioShack Corporation, United States District Court, Eastern District of Pennsylvania, Case No. 03 CV 0032, Deposition Testimony on May 18, 2005.

> Perez et al. v. RadioShack Corporation, United States District Court, Northern District of Illinois, Eastern Division, Case No. 02-CV-7884, Deposition Testimony on December 13, 2005.

> United States of America ex rel. A. Scott Pogue v. American Healthcorp Inc., Diabetes Treatment Centers of America Inc., et al., United States District Court, Middle District of Tennessee at Nashville, Civil No. 3-94-0515, Deposition Testimony on May 12, 2006.

> School Districts' Alliance v. State of Washington, United States District Court, Eastern District of Thurston, Case No. 04-2-02000-7, Deposition Testimony on July 20, 2006.

> Boca Raton Community Hospital, Inc., a Florida not-for-profit corporation d/b/a Boca Raton Community Hospital, on behalf of itself and on behalf of Class of all others similarly situated v. Tenet Healthcare Corp., a Nevada Corporation, United States District Court,  Southern District of Florida, Miami Division, Case No. 05-80183-CIV-SEITZ/MCALILEY, Deposition Testimony on July 25, 2006.

> Boca Raton Community Hospital, Inc., a Florida not-for-profit corporation d/b/a Boca Raton Community Hospital, on behalf of itself and on behalf of Class of all others similarly situated v. Tenet Healthcare Corp., a Nevada Corporation, United States District Court,  Southern District of Florida, Miami Division, Case No. 05-80183-CIV-SEITZ/MCALILEY, Deposition Testimony on October 13, 2006.

- Louise Ogborn v. McDonald's Corporation et al., Commonwealth of Kentucky 55th Judicial District, Bullitt County Circuit Court, Case No. 04-CI-00769, Deposition Testimony on October 19, 2006.

- Elise Davis v. Kohl's Department Stores, Inc. consolidated with Rosie Grindstaff v. Kohl's Department Stores, Inc., Superior Court of the State of California for County of Los Angeles Central District, Case No. BC 327426 (lead case) consolidated with Case No. BC 341954, Deposition Testimony on April 25, 2007.

- Norman Utley, et al., v. MCI, Inc., MCI Worldcom Communications, Inc., and MCI Network Services, Inc., formerly known as MCI Worldcom Network Services, Inc., United States District Court, Northern District of Texas, Dallas Division, Civil Action No. 3:05 - CV- 0046 - K, Deposition Testimony on May 30, 2007.

- Ramon Moreno and Ernesto Morailo, on behalf of themselves and all others similarly situated v. Guerrero Mexican Food Products Inc., a division of Gruma Corporation; and Gruma Corporation, a Nevada Corporation, United States District Court, Central District of California, Case No. CV05-773RSWL(PLAx), Deposition Testimony on August 10, 2007.

- Darensburg et al. v. Metropolitan Transportation Commission, U.S. District Court, Northern District of California, Case No. C-05-1597-EDL, Deposition Testimony on March 18, 2008.

- In Re: King Pharmaceuticals, INC, Derivative Litigation, Lead Case No: BOO19077(M), The Chancery Court, Sullivan County at Bristol, Tennessee, Deposition Testimony on April 4, 2008.

- P. Ansley et al. v. Lewis Homes of California, a California General Partnership, et al., Superior Court of the State of California, For the County of Solano, Case No. FCS02445, Deposition Testimony on April 10, 2008.

- Personnel Plus v. Ashish Wahi et al., Superior Court of the State of California, County of Orange, Case No. 07CC08363, Deposition Testimony on August 13, 2008.

- First Capitol Consulting Inc. v. LVX, Inc. et al., Superior Court of the State of California for the County of Los Angeles, Case No. BC378202, Deposition Testimony on October 27, 2008.

- R. Molina et al. v. Lexmark International, Inc., Superior Court of the State of California for the County of Los Angeles, Case No. BC339177, Deposition Testimony on November 19, 2008.

- In re National Century Financial Enterprises, Inc. Investment Litigation, No. 2:03-MD-1565-JLG-MRA (S.D.Ohio), Deposition Testimony on January 22, 2009.

- New York City Employees' Retirement System, et al. v. Bank One, N.A., et al., Case No. 03-cv-09973 (LAK) (S.D.N.Y.), Deposition Testimony on January 22, 2009.

- Dole Fresh Fruit International, Ltd, Hyundai Precision America, Inc., JAMS Arbitration, ADRS Case #05-1138-RTA, Deposition Testimony on December 21, 2009.

- D. Berry, L. Hedges et al. v. Volkswagen of America, Inc., In The Circuit Court of Jackson County, Missouri, at Independence, No. 0516-CV01171 Division 2, Deposition Testimony on February 18, 2010.

> D. Aberle et al. v. Davidson Builders, Inc., et al., Superior Court of the State of California, County of Orange, Case No.: 37-2008-00083718-CU-CD-CTL, Deposition Testimony on March 24, 2010.

> Urga, et al. v. Redlands Community Hospital, Superior Court of the State of California, County of San Bernardino, Case No. SCVSS 123769, Deposition Testimony on May 17, 2010.

> Oberschlake, et al v. St. Joseph Hospital of Orange, et al, Superior Court of the State of California, County of Orange, Case No. 05CC00301, Deposition Testimony on August 12, 2010.

> J. Morrison v. The Vons Companies, Inc., Superior Court of State of California, County of San Diego, Case No. 37-2009-00081026-CU-BT-CTL, Deposition Testimony on December 7, 2010

> R. Pate, et al. v. Children's Hospital of Orange County, Superior Court of California, County of Orange, Case No. 05CC00303, Deposition Testimony on April 13, 2011

> M. St. Croix, et al. v. Cedar Fair, L.P., et al., Superior Court of California, County of Orange, Case No. 30-2008-0214500, Deposition Testimony on August 22, 2011.

> Steven Domalewski, a minor v. Hillerich and Bradsby Co., et al., Superior Court of New Jersey, Passaic County, Docket No.: PAS-L-2119-08, Deposition Testimony on January 5, 2012.

> Cathleen McDonough, et al., v. Horizon Blue Cross/Blue Shield of New Jersey, United States District Court, District of New Jersey, Civil Action No. 09-cv-00571-(SRC) (PC), Deposition Testimony on January 10, 2012.

## 2. Testimony

> State of Tennessee, ex rel., Douglas Sizemore, Petitioner vs. Xantus Healthplan of Tennessee, Inc., Chancery Court of Davidson County, Tennessee at Nashville, Case No 99-917-II, Trial Testimony, October 16, 2001.

> State of Tennessee, ex rel., Douglas Sizemore, Petitioner vs. Xantus Healthplan of Tennessee, Inc., Chancery Court of Davidson County, Tennessee at Nashville, Case No 99-917-II, Rebuttal Testimony, October 26,2001.

> Howard Wright, Inc., a California corporation doing business as AppleOne Employment Services, Plaintiffs, vs. Olsen Staffing Services, Inc., a Delaware Corporation, Dagney Smith, an individual, Vicky Riechers, an individual, and Linda Shiftman, an individual, Defendants, Superior Court of the State of California for the County of Los Angeles, Case No. BC 200657, Trial Testimony, March 4, 2002.

> Columbia/HCA Healthcare Corporation - Billing Practices Litigation, United States District Court, Middle District of Tennessee, Nashville Division, Case No. 3-98-MDL-1227 on June 28, 2002.

> Sacred Heart Medical Center, et al., Plaintiffs v. Department of Social and Health Services, and Dennis Braddock, the Secretary of the Department of Social and Health Services, Defendants, Superior Court of the State of Washington in and for the County of Thurston, No. 00-2-01898-1, Testimony in Liability Trial, April 14, 2003.

- Diversified Property, a general partnership, Dora Saikhon Family Trust, and Nancy Saikhon Borrelli, an individual, Plaintiffs v. Manufacturers Life Insurance (U.S.A.), a Michigan corporation, erroneously sued as Manufacturers Life Insurance Company, Inc., Defendants in the Superior Court of California, County of San Diego, Case No.: GIC 815128, Trial Testimony on October 25, 2004.

- Bridgestone/Firestone North American Tire v. Sompo Japan Ins. Co. of America, United States District Court for the Middle District of Tennessee Nashville Division Civil Action NO. 3-02-1117, March 7, 2005

- Group Anesthesia Services, A Medical Group, Inc., Claimant, vs. American Medical Partners of North Carolina, Inc., etc., et al., Respondents, JAMS Arbitration, Reference No. 1100040919, Arbitration Testimony on March 23, 2005.

- Goldman et al. v. RadioShack Corporation, United States District Court, Eastern District of Pennsylvania, Case No. 03 CV 0032, Testimony in Liability Trial, on June 28, 29, 2005.

- Goldman et al. v. RadioShack Corporation, United States District Court, Eastern District of Pennsylvania, Case No. 03 CV 0032, Rebuttal Testimony in Liability Trial, on July 5, 2005.

- Mauna Loa Vacation Ownership LLP v. Accelerated Assets, LLP. United States District Court, District of Arizona, Case No. CIV 03-0846 PCT DGC. Trial Testimony, on February 22, 2006.

- School Districts' Alliance v. State of Washington, United States District Court, Eastern District of Thurston, Case No. 04-2-02000-7, Trial Testimony on November 13, 2006.

- In the Matter of Premier Medical Group, PC, Appellant – Department of Health and Human Services, Office of Medicare Hearings and Appeals, Southern Field Office, ALJ Appeal No. 1-221579701, Medicare Appeal No. 1-18761858, Provider No. 3706654, AR No. 9406352171039, Judge Zaring Robertson, US Administrative Law Judge, Testimony on April 1, 2008.

- Darensburg et al. v. Metropolitan Transportation Commission, U.S. District Court, Northern District of California, Case No. C-05-1597-EDL, Trial Testimony on October 9, 2008.

- R. Molina et al. v. Lexmark International, Inc., Superior Court of the State of California for the County of Los Angeles, Case No. BC339177, Trial Testimony on October 22 and 26, 2009.

- Dole Fresh Fruit International, Ltd, Hyundai Precision America, Inc., ADRS Case #05-1138-RTA, Trial Testimony on February 19, 2010.

- In the matter of University of Tennessee Cancer Institute, ALJ Appeal No. 1-446 575 318, Office of Medicare Hearings & Appeals, Judge Z. Robertson, US Administrative Law Judge, Trial Testimony on April 20, 2010.

- Urga, et al. v. Redlands Community Hospital, Superior Court of the State of California, County of San Bernardino, Case No. SCVSS 123769, Trial Testimony on July 20, 2010.

- Marine Engineers' Beneficial Association v. Department of Transportation, Ferries Division Federal Mediation & Conciliation Service Cause No. 110105-52404-6 AGO Matter No. 10499471, July 19, 2011.

➢ Richard Robinson v. County of Los Angeles, et, al., United States District Court of California, Central District, Case No. CV06-2409 GAF (VBKx), Trial Testimony on December 1, 2011.

## PUBLICATIONS

➢ Boedeker, Stefan and Goetz Trenkler (2001) - "A Comparison of the Ridge and Iteration Estimator" - in: Econometric Studies: A Festschrift in Honour of Joachim Frohn (ed. by Ralph Friedmann, Lothar Knueppel, and Helmut Luetkepohl), New Brunswick

## PROFESSIONAL AND BUSINESS HISTORY

➢ Berkeley Research Group, March 2010 -Present, Director

➢ Resolution Economics, 2008-2010, Partner

➢ Alvarez & Marsal, 2007-2008, Managing Director

➢ LECG LLC, 2005-2007, Director

➢ Navigant Consulting Inc., 2004-2005, Managing Director in Litigation and Investigation Practice

➢ Deloitte & Touche LLP, 2003 - 2004, Leader of the Economic and Statistical Consulting Practice in the West Region

➢ PricewaterhouseCoopers LLP, 2002 – 2003, Leader of the Litigation Consulting Group in Los Angeles, Leader of the Economic and Statistical Consulting Practice in the West Region

➢ Andersen LLP, 1992- 2002 – Partner (since 2000), last position held: Director of Economic and Statistical Consulting practice in the Pacific Region

➢ University of California, San Diego, 1989-1991 – Teaching Assistant, Department of Economics

➢ German Government, 1986-1989 -- Economic Research Assistant